## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JEFFREY MAURER, Individually and On Behalf of All Others Similarly Situated, <br><br>                   Plaintiff, <br><br>   v. <br><br> ARGOS THERAPEUTICS INC., JEFFREY ABBEY, LORI HARRELSON and RICHARD KATZ, <br><br>                Defendants. | Civil Action No. 1:17- cv-216 <br><br> **CLASS ACTION** <br><br> **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Jeffrey Maurer ("Plaintiff"), by his attorneys, except for his own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Argos Therapeutics, Inc. ("Argos" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons who purchased or otherwise acquired Argos securities between February 7, 2014, and February 21, 2017, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934

(the "Exchange Act"). Plaintiff's claims are asserted against certain of Argos' executive officers and directors.

2.     Argos is an immune-oncology company focused on the development and commercialization of individualized immunotherapies for the treatment of cancer and infectious diseases based on a proprietary technology platform called Arcelis.

3.     Argos' most advanced product candidate is AGS-003, also called rocapuldencel-T, for the treatment of metastatic renal cell carcinoma ("mRCC") and other cancers. Rocapuldencel-T is designed to capture mutated and variant antigens that are specific to each patient's tumor and induce an immune response targeting that patient's tumor antigens. Argos is also developing AGS-004 for the treatment of HIV. AGS-003 and AGS-004 are both Arcelis-based.

4.     AGS-003 is being evaluated in a pivotal ADAPT Phase 3 clinical trial for the treatment of mRCC ("ADAPT"), which was initiated in January 2013.  Enrollment for ADAPT Phase 3 was completed in July 2015 and a total of 462 mRCC patients were randomized to the trial. The primary endpoint of the trial is a statistically significant improvement in overall survival.

5.     On February 22, 2017, prior to the market opening, Argos filed a Form 8-K with the SEC announcing that the Independent Data Monitoring Committee ("IDMC") for ADAPT recommended that the study be discontinued for futility, finding that the study was unlikely to demonstrate a statistically significant improvement in overall survival ("Feb. 2017 Form 8-K"). The Feb. 2017 Form 8-K stated in pertinent part:

**Item 8.01      Other Events.**

On February 22, 2017, Argos Therapeutics Inc. ("Argos" or the "Company") announced that **the Independent Data Monitoring Committee ("IDMC") for the Company's pivotal Phase 3 ADAPT clinical trial of rocapuldencel-T in combination with sunitinib/standard-of-care for the treatment of metastatic renal cell carcinoma has recommended that the study be discontinued for futility based on its planned interim data analysis. The IDMC concluded that the study was unlikely to demonstrate a statistically significant improvement in overall survival in the combination treatment arm, utilizing the intent-to-treat population, the primary endpoint of the study.** The IDMC noted that rocapuldencel-T was generally well-tolerated in the trial.

In conjunction with its clinical and scientific advisors, the Company is analyzing the preliminary ADAPT trial data set and plans to discuss the data with the U.S. Food and Drug Administration ("FDA"). The Company plans to leave the ADAPT trial open while the Company conducts its ongoing data review and discussions with FDA. Based on these analyses and discussions, the Company will make a determination as to the next steps for the rocapuldencel-T clinical program.

Emphasis Added.

6.      On the release of the news, the Company's share price declined from a closing price of $4.40 per share on February 21, 2017 to $1.48 per share on February 22, 2017, *a drop of approximately 66%.*

## JURISDICTION AND VENUE

7.      The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

9.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District.  Argos is headquartered in this District, with its principal place of business located at 4233 Technology Drive, Durham, NC 27704.

<u>PARTIES</u>

11.     Plaintiff purchased Argos securities as set forth herein and in his certification filed herewith.  (<u>See</u> Exhibit A.)

12.     Defendant Argos is a Delaware company with its principal executive offices located at 4233 Technology Drive, Durham, North Carolina 27704. Argos' common stock trades on the NasdaqGM under the ticker symbol "ARGS."

13.     Defendant Jeffrey D. Abbey ("Abbey") has been the Company's Chief Executive Officer ("CEO") and President since February 2010.  Abbey served in various other positions at the Company from September 2002 to February 2010, including as Vice President of Business Development from February 2004 to January 2009, and Chief Business Officer from January 2009 to February 2010.

14.     Defendant Lori Harrelson ("Harrelson") has been the Company's Vice President of Finance since July 2011.  Harrelson has also served as Argos Director of

Finance and Accounting from January 2007 to July 2011 and Director of Accounting and Financial Reporting from September 2004 to January 2007.

15.     Defendant Richard D. Katz ("Katz") is the Company's Chief Financial Officer and Vice President.

16.     Defendants Abbey, Harrelson and Katz are collectively referred to herein as the "Individual Defendants."

17.     Argos and the Individual Defendants are collectively referred to herein as the "Defendants."

## CONTROL PERSON ALLEGATIONS

18.     By reason of the Individual Defendants' positions with the Company as executive officers, the Individual Defendants possessed the power and authority to control the contents of Argos' quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Company Background

19.     Argos is an immune-oncology company focused on the development and commercialization of individualized immunotherapies for the treatment of cancer and infectious diseases based on a proprietary technology platform called Arcelis.

20.     Arcelis utilizes biological components from a patient's virus cells to generate an individualized immunotherapy. These immunotherapies employ specialized white blood cells called dendritic cells to activate an immune response specific to the patient's own disease.

21.     Argos' most advanced product candidate is AGS-003, also called rocapuldencel-T, for the treatment of metastatic renal cell carcinoma ("mRCC") and other cancers. Rocapuldencel-T is designed to capture mutated and variant antigens that are specific to each patient's tumor and induce an immune response targeting that patient's tumor antigens. Argos is also developing AGS-004 for the treatment of HIV. AGS-003 and AGS-004 are both Arcelis-based.

22.     AGS-003 is being evaluated in a pivotal ADAPT Phase 3 clinical trial for the treatment of mRCC ("ADAPT"), which was initiated in January 2013.  The randomized Phase 3 ADAPT trial evaluates rocapuldensel-T plus sunitinib/standard-of-care therapy versus standard-of-care therapy alone in newly diagnosed mRCC patients. Enrollment for ADAPT Phase 3 was completed in July 2015 and a total of 462 mRCC patients were randomized to the trial. The primary endpoint of the trial is a statistically significant improvement in overall survival.

*The Material Misrepresentations and Omissions*

23.     On December 30, 2013, Argos filed a Form S-1 with the SEC (the "S-1"), announcing the Company's intent to apply to list its common stock on the NASDAQ under the symbol "ARGS." The S-1 identified AGS-303 as its most advanced product candidate:

> We are currently enrolling patients in a pivotal phase 3 clinical trial of AGS-003 in combination with sunitinib (Sutent) for the treatment of mRCC under a special protocol assessment, or SPA, with the Food and Drug Administration, or FDA. The primary endpoint of the phase 3 clinical trial is overall survival. In our phase 2 clinical trial of AGS-003 in combination with sunitinib in mRCC patients, median overall survival was 30.2 months. This compares to median overall survival of 14.7 months in 1,189 mRCC patients with similar risk factors who were treated with sunitinib or other targeted therapies as shown in data collected by the International Metastatic Renal Cell Carcinoma Database Consortium, or the Consortium. We are developing our second Arcelis product candidate, AGS-004, for the treatment of HIV and are conducting a phase 2b clinical trial of AGS-004 that is being funded entirely by the National Institutes of Health, or NIH, under a $39.3 million contract.

24.     The S-1 stated that Argos "established an independent data monitoring committee that will conduct interim analyses of the trial data for safety and futility at such times as 25%, 50% and 75% of the required events in the trial have occurred."

25.     On January 21, 2014, Argos filed an amendment to the S-1, stating the Company is offering 4,250,000 in the IPO for a price between $13-$15 per share. A second amendment to the S-1 was filed on February 4, 2014.

26.     On February 6, 2014, NASDAQ approved Argos for listing on NASDAQ .

27.     On February 7, 2014, Argos announced its IPO of 5,625,000 shares of common stock at a public offering price of $8.00 per share. Argos completed its IPO that same month,

selling 6,228,725 shares of its common stock for aggregate gross proceeds of $49.8 million.

28.     On March 24, 2014, Argos issued a press release, also attached to a Form 8-K

filed with the SEC, commenting on the IPO and the Company's expectations for the Phase 3

ADAPT trial:

> **DURHAM, N.C., (March 27, 2014)** — Argos Therapeutics, Inc. (NASDAQ: ARGS) a biopharmaceutical company focused on the development and commercialization of fully personalized immunotherapies for the treatment of cancer and infectious diseases using its Arcelis™ technology platform, today reported financial results for the fourth quarter and year ended December 31, 2013 and provided an update on the Company's clinical programs.
>
> **"We are pleased with the advances made over the past 15 months at Argos. We completed two successful financings, a Series E financing in 2013 and an initial public offering last month, raising an aggregate of $91.1 million that we expect will enable us to complete the pivotal Phase 3 ADAPT trial of our lead product candidate, AGS-003, in metastatic renal cell carcinoma (mRCC)** and to complete proof-of-concept studies of our second product candidate, AGS-004, in patients infected with the human immunodeficiency virus (HIV)," said Jeff Abbey, president and chief executive officer.
>
> Mr. Abbey continued, **"We are also excited by the clinical progress we've made in validating our Arcelis immunotherapy technology platform. We presented data from a Phase 2 trial of AGS-003 which showed a statistically significant correlation between the magnitude of the immune response and overall survival. AGS-003 is the only immunotherapy we are aware of to show this effect with statistical significance.** Recently, data presented at the Conference on Retroviruses and Opportunistic Infections (CROI) in Boston demonstrated that AGS-004 induced anti-viral T memory stem cell-like immune responses in patients with HIV in our Phase 2a trial. These data support our goal of pioneering a new treatment paradigm of personalizing immunotherapy for cancer and infectious disease."

Emphasis Added.

29.     On November 13, 2014, Argos issued a press release, also attached to a Form 8-K filed with the SEC ("November 2014 Press Release"), announcing third quarter 2014 financial and operating results, which identified a positive outlook for the ADAPT trial. The November 2014 Press Release stated, in pertinent part:

### Argos Therapeutics Reports Third Quarter 2014 Financial Results and Operational Highlights
### Conference Call and Webcast Today, November 13th, at 4:30 p.m. ET

DURHAM, N.C., Nov. 13, 2014 (GLOBE NEWSWIRE) -- Argos Therapeutics, Inc. (Nasdaq:ARGS), a biopharmaceutical company focused on the development and commercialization of fully personalized immunotherapies for the treatment of cancer and infectious diseases using its Arcelis® technology platform, today reported financial results for the third quarter ended September 30, 2014, and provided an update on the Company's clinical programs.

**"We are extremely pleased with the progress we have made in our clinical programs over the last few months. In our ADAPT phase 3 trial of AGS-003 in metastatic renal cell carcinoma (mRCC), we are now well over halfway through target enrollment and remain on track to complete enrollment by the end of the first quarter of next year,"** said Jeff Abbey, president and chief executive officer. "We also look forward to the results from our phase 2b clinical trial of AGS-004 in chronically infected HIV patients. Treatment of all patients has been completed, the analysis is nearing completion and we anticipate having the data later this year. We are optimistic these data will further validate the ability of AGS-004, and more broadly, our Arcelis technology platform, to induce memory T cell responses."

Mr. Abbey continued, "We are also pleased with the progress we have made as a company during the last few months. At the end of September, we closed on a $25 million venture loan facility led by Horizon Technology Finance Corporation. We plan to devote

the loan proceeds to the continuing development of our innovative product candidates, including the building of a state-of-the-art 100,000 square foot biomanufacturing facility near Research Triangle Park, on which we have just broken ground. We are also excited to have been issued a key patent related to our Arcelis technology platform, which significantly expands Arcelis' protection relating to the maturation method used in the manufacture of our dendritic cell immunotherapies for treatment of cancer and infectious disease. **With these things in place, we believe we are well positioned to continue with the development of our two lead investigational immunotherapies.**"

**Recent Highlights and Anticipated Milestones**

AGS-003 Program

- Phase 3 ADAPT clinical trial in mRCC:

    o Over 130 active clinical sites
    o Enrollment has surpassed 60% of target
    o More than 260 patients have been randomized in the trial
    o More than 700 patients have participated in the initial tumor collection phase of the trial
    o On track to complete enrollment in the first quarter of 2015
- Investigator-initiated phase 2 clinical trial in early stage RCC initiated; additional investigator-initiated trials in early stage RCC, non-clear cell mRCC and other solid tumors planned to initiate in early 2015

Emphasis Added.

30.     On January 9, 2015, Argos issued a press release also attached to a Form 8-K filed with the SEC ("Jan. 2015 Press Release") announcing that the Phase 2b trial for AGS-004 failed to achieve its primary endpoint. AGS-004 also utilizes the Arcelis technology platform. The press release stated in relevant part:

DURHAM, N.C., Jan. 9, 2015 (GLOBE NEWSWIRE) -- Argos Therapeutics Inc. (Nasdaq:ARGS) ("Argos"), a biopharmaceutical company focused on the development and commercialization of fully personalized immunotherapies for the treatment of cancer and infectious diseases based on the Arcelis® technology platform, today provided an update on its clinical research program for AGS-004, the company's investigational fully personalized immunotherapy for the treatment of HIV. The company announced top-line results of its double-blind, placebo-controlled Phase 2b clinical trial of AGS-004 in patients chronically infected with HIV-1. **The primary endpoint of the trial, which required a 1.1 Log lower median viral load (VL) after 12 weeks of interruption of antiretroviral therapy (ATI) in the treatment group versus the placebo group, was not achieved**.

Importantly, however, data from the trial provided evidence of the ability of AGS-004 to induce memory T-cell responses which may have directly impacted the latent viral reservoir. Of the patients who received AGS-004 and completed ATI, approximately 70 percent had positive antiviral memory T-cell responses prior to ATI versus zero percent of placebo patients. Also, within the AGS-004 treatment group, those patients that had antiviral memory T-cell responses had significantly fewer CD4+ T-cells with integrated HIV DNA when compared to non-responders. These findings relate directly to the utilization of AGS-004 in an ongoing adult eradication study and a planned pediatric study, where one of the key objectives is to decrease the latent HIV reservoir. The ongoing adult eradication study is expected to enter stage two in the coming months, and the pediatric study is planned to initiate this year.

"The results of the AGS-004 Phase 2b trial allow us to now ask if combining AGS-004 treatment with HDAC inhibitors, part of a new class of latent reservoir mobilizers, will lead to the elimination of HIV-infected cells," stated Dr. David Margolis of the University of North Carolina, principal investigator of the AGS-004 Phase 2a adult eradication study. "We look forward to initiating stage two of the adult eradication study where patients on ART will receive the HDAC inhibitor vorinostat in addition to AGS-004."

Emphasis Added.

31.     On March 31, 2015, Argos filed a Form 10-K with the SEC.  The Company

stated:

>Our most advanced product candidate is AGS-003, which we
>are developing for the treatment of metastatic renal cell
>carcinoma, or mRCC, and other cancers. We are currently
>conducting a pivotal phase 3 clinical trial of AGS-003 plus
>sunitinib and other targeted therapies for the treatment of
>newly diagnosed mRCC under a special protocol assessment,
>or SPA, with the Food and Drug Administration, or FDA.
>Patients in the trial will initially be treated with sunitinib.
>However, under the trial protocol, if sunitinib is discontinued
>due to disease progression or toxicity, it can be replaced with
>another approved targeted therapy. We refer to this trial as the
>ADAPT trial. We initiated the ADAPT trial in January 2013
>and dosed the first patient in May 2013. We expect to complete
>enrollment by the end of second quarter 2015 and that the first
>interim analysis by the trial's independent data monitoring
>committee will be conducted in second quarter 2015. **We also
>expect to have data from this trial in the second half of 2016
>when we anticipate the required number of events to
>permit the primary analysis and assessment of overall
>survival to have occurred.**
>
>**We believe that AGS-003 may be capable of treating a wide
>range of cancers and are planning to evaluate AGS-003 in
>clinical trials in additional cancer indications.**

Emphasis Added.

32.     The Form 10-K contained certifications pursuant to the Sarbanes-Oxley Act

of 2002 ("SOX") by Individual Defendants Abbey and Harrelson, stating that the financial

information contained therein was accurate and disclosed any material changes to the

Company's internal control over financial reporting.

33.     On May 13, 2015, Argos issued a press release ("May 2015 Press Release")
announcing updates on the enrollment progress for ADAPT. The press release stated in
relevant part:

> DURHAM, N.C., May 13, 2015 (GLOBE NEWSWIRE) -- Argos
> Therapeutics Inc. (Nasdaq:ARGS) ("Argos"), an immuno-oncology
> company focused on the development and commercialization of
> fully personalized immunotherapies for the treatment of cancer
> based on the Arcelis® technology platform, today announced that
> **more than 1,000 tumor samples have been collected and
> approximately 400 eligible patients have been randomized to the
> company's ongoing, pivotal phase 3 ADAPT clinical trial of
> AGS-003 for the treatment of metastatic renal cell carcinoma
> (mRCC)**.
>
> "We have observed a significant level of interest in this trial
> evaluating AGS-003, a fully customized and well-tolerated
> immunotherapy, in combination with standard surgery and targeted
> therapy for patients who present with newly diagnosed, metastatic
> kidney cancer," said ADAPT trial principal investigator Dr. Robert
> Figlin, the Steven Spielberg Family chair in hematology oncology
> and professor of medicine and biomedical sciences at the Cedars-
> Sinai Samuel Oschin Comprehensive Cancer Institute. "**With the
> strong multidisciplinary collaboration between urologists and
> oncologists across our study base, we are excited to be
> completing enrollment to this important trial in the coming
> weeks**."
>
> ***
>
> The ADAPT trial is designed to enroll approximately 450 patients.
> To qualify, patients must be good candidates for standard surgery
> and targeted drug therapy. Thus far more than 50 percent of patients
> who have consented for tumor collection and been screened for the
> treatment phase of the trial have been ineligible for treatment
> because of non-clear cell histology, ineligibility for targeted drug
> therapy, poor performance status, poor prognosis after surgery, a
> lack of evaluable metastatic disease, and other factors. The company
> expects to conclude the enrollment phase of the ADAPT trial by the
> end of June 2015.
>
> ***
>
> "**We continue to be pleased and highly encouraged by the
> tremendous interest in the largest global trial ever performed in**

the newly diagnosed, unfavorable risk mRCC patient population," said Jeff Abbey, president and CEO of Argos. "Even with surgery and approved targeted therapies, these mRCC patients are only expected to survive an average of 15 months after diagnosis. We look forward to the readout from this trial by the second half of 2016, when we hope to confirm the encouraging survival results we observed in our phase 2 trial involving AGS-003 combined with sunitinib."

Emphasis added.

34.     On June 4, 2015, Argos issued a press release, announcing that the IDMC recommended continuation of ADAPT ("June 2015 Press Release"). The press release stated in pertinent part:

> DURHAM, N.C., June 4, 2015 (GLOBE NEWSWIRE) -- Argos Therapeutics Inc. (Nasdaq:ARGS) ("Argos"), an immuno-oncology company focused on the development and commercialization of fully personalized immunotherapies for the treatment of cancer based on the Arcelis® technology platform, today announced **an independent data monitoring committee (IDMC) has recommended the continuation of the company's pivotal phase 3 ADAPT clinical trial of AGS-003 for the treatment of metastatic renal cell carcinoma (mRCC) following the first of three planned interim data analyses.**
>
> The IDMC recommendation coincided with an update on enrollment in the ADAPT trial presented at the 2015 American Society of Clinical Oncology (ASCO) Annual Meeting by principal investigator Dr. Robert Figlin, the Steven Spielberg Family chair in hematology oncology and professor of medicine and biomedical sciences at the Cedars-Sinai Samuel Oschin Comprehensive Cancer Institute. In a poster presentation titled "Patient identification and eligibility insights in the synchronous metastatic RCC population: An update from the ongoing ADAPT phase 3 study experience" (abstract TPS4582), Dr. Figlin noted more than 1,000 tumor samples have been collected and approximately 400 patients have been randomized to the treatment phase of the study thus far.
>
> **"We are very pleased with the progress of the ADAPT phase 3 trial to evaluate AGS-003, which is generating great interest**

**within the advanced kidney cancer community**," said Dr. Figlin. "**We look forward to further IDMC reviews and interim data readouts as we advance the largest global trial ever performed in the newly diagnosed, unfavorable risk mRCC patient population.**"

AGS-003 is an autologous dendritic-cell based immunotherapy designed to induce a memory T-cell response specific to a patient's tumor antigens. In an open-label phase 2 study, treatment with AGS-003 plus sunitinib yielded a median overall survival of more than 30 months in newly diagnosed, unfavorable risk mRCC patients. The randomized phase 3 ADAPT study evaluating standard targeted therapy plus AGS-003 is designed to enroll about 450 mRCC patients in total.

"**We are on the cusp of a very important and exciting period in the development of AGS-003**," said Mr. Jeffrey D. Abbey, president and chief executive officer of Argos. "**We welcome the IDMC recommendation to continue our pivotal ADAPT trial and are in position to complete patient enrollment this summer as planned**."

Emphasis Added.

35.     On December 10, 2015, Argos issued a similar press release for the second planned interim analysis of ADAPT. Argos also announced recommendation of continuation by the IMDC.

36.     On March 7, 2016, Argos issued a press release, also attached to a Form 8-K filed with the SEC, announcing that it entered into a securities purchase agreement for the sale of up to $60 million of Argos common stock and warrants in private placement financing ("March 2016 Press Release"). The press release stated in pertinent part:

DURHAM, N.C., March 7, 2016 – Argos Therapeutics, Inc. (Nasdaq: ARGS) ("Argos"), an immuno-oncology company focused on the development and commercialization of truly individualized immunotherapies for the treatment of cancer based on the Arcelis® technology platform, today announced that **it has entered**

**into a securities purchase agreement for the sale of up to $60 million of Argos common stock and warrants in a private placement financing. Argos expects that this financing will fund operations into the second quarter of 2017, when the Company expects to have final data from its pivotal phase 3 ADAPT trial of AGS-003 (the "ADAPT Study").**

The financing will take place in up to three tranches. Under the securities purchase agreement, at the initial closing, which is expected to occur on or about March 9, 2016, Argos will sell and the investors will purchase, for a total purchase price of $19,882,915, a total of 3,652,430 shares of common stock and warrants to purchase a total of 2,739,323 shares of common stock (0.75 shares of common stock for each share of common stock purchased), based on a purchase price per share of common stock and accompanying warrant equal to $5.44375. At the second closing, Argos has agreed to sell and the investors have agreed to purchase, for an additional purchase price of $29,824,520, a total of 5,478,672 shares of common stock and warrants to purchase a total of 4,109,005 shares of common stock at the same price and on the same terms as the first tranche. **The second closing is conditioned on the Independent Data Monitoring Committee (the "IDMC") for the ADAPT Study at or following the IDMC's next regular meeting following the initial closing (currently scheduled for June 2016) (the "First IDMC Meeting") recommending that Argos continue the ADAPT Study or discontinue the ADAPT Study based on favorable efficacy data.** The warrants to be issued in each closing will have an exercise price of $5.35 per share and expire five years from the date of issuance. Participants in the financing include Pharmstandard International S.A., Forargos B.V., Tianyi Lummy International Holdings Group Ltd., China BioPharma Capital I, L.P., TVM V Life Science Ventures GmbH & Co. KG and Wasatch Funds Trust.

Under the securities purchase agreement, **Pharmstandard has also agreed that, at Argos's option following the satisfaction of certain conditions, including the IDMC having made a recommendation at or following its next regular meeting after the First IDMC Meeting (currently anticipated to be held in November or December 2016), that the Company continue the ADAPT Study or discontinue the ADAPT Study based on favorable efficacy data, and the Company's cash position at such time, it shall purchase at the third closing up to $10,292,563 of**

**shares of common stock** (without warrants) at a price per share to be determined pursuant to an agreed upon formulation. The dollar amount committed to be purchased by Pharmstandard at the third closing is subject to reduction on a dollar-for-dollar basis for certain cash amounts raised by Argos after the initial closing through equity or debt financings or collaborations. All three closings will be subject to the satisfaction of certain customary closing conditions.

Argos expects that the proceeds from the initial closing will enable it to fund the company's ongoing expenses into the third quarter of 2016, and that the proceeds from all three closings, if such closings occur, will enable it to fund the company's ongoing expenses into the second quarter of 2017 when it expects final data from its pivotal phase 3 ADAPT trial of AGS-003.

Emphasis Added.

37. On March 30, 2016, Argos filed a Form 10-K with the SEC. The Company stated:

Based upon the actual rate of enrollment and projected event rate as defined in the protocol, we anticipate having a sufficient number of events to permit the primary analysis and assessment of overall survival to occur in the first half of 2017. The independent data monitoring committee for the ADAPT trial has twice recommended the continuation of the ADAPT trial based on results of its data analyses for safety and futility. We expect the independent data monitoring committee to meet again in June 2016 and approximately six months later in 2016 to conduct additional data analyses.

38. The Form 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Individual Defendants Abbey and Harrelson, stating that the financial information contained therein was accurate and disclosed any material changes to the Company's internal control over financial reporting.

39. On April 19, 2016, Argos announced a reduction of its workforce by 18 employees (13%) to continue operations of ADAPT, and the resignation of Argos' Chief

Operating Officer ("COO") Fred Miesowicz. Argos stock dropped from a closing price of $10.69 per share on April 19, 2016 to $8.05 per share on April 20, 2016.

40.    On June 13, 2016, Argos filed a Form 8-K with the SEC announcing that the IDMC for ADAPT recommended continuation. Argos also announced that the IDMC's positive review triggered the second tranche of financing and the receipt of $29,824,520 from the sale of shares of common stock and warrants.

41.    On July 28, 2016, Argos entered into an underwriting public offering agreement of 9,090,909 shares of common stock and warrants to purchase up to 6,818,181 shares of common stock. Argos expected net proceeds of about $50 million.

42.    On January 9, 2017, Argos filed a Registration Statement Form S-3 with the SEC for the sale of securities for a maximum aggregate offering price of $200 million ("S-3"). The S-3 stated a name change of AGS-003 to rocapuldencel-T.

43.    On January 19, 2017, Argos issued a press release, also attached to a Form 8-K filed with the SEC, announcing expansion plans for the initial commercialization of rocapuldencel-T.  The press release stated, in pertinent part:

> **Argos Therapeutics Completes Lease Agreement for Commercial Manufacturing Space on the Centennial Campus of North Carolina State University**
>
> 40,000 square feet of newly constructed space at the Center for Technology & Innovation to support initial commercialization of company's individualized immunotherapies
>
> DURHAM, N.C., Jan. 19, 2017 (GLOBE NEWSWIRE) -- Argos Therapeutics Inc. (Nasdaq:ARGS) ("Argos"), an immuno-oncology company focused on the development and commercialization of individualized immunotherapies based

on the **Arcelis®** precision immunotherapy technology platform, announced today the completion of a lease agreement with Keystone-Centennial II, LLC, for 40,000 square feet of newly constructed manufacturing space at the Center for Technology & Innovation (CTI) on the Centennial Campus of North Carolina State University in Raleigh, NC.

**Argos plans to use the manufacturing space at CTI to prepare for submission of a biologics license application (BLA) to the U.S. Food & Drug Administration and to support initial commercialization of rocapuldencel-T,** the company's most advanced product candidate, which is being evaluated for the treatment of metastatic renal cell carcinoma (mRCC) in the company's pivotal **ADAPT Phase 3** clinical trial. Because the company's **Arcelis®** technology platform enables broad geographic coverage from a single facility, CTI is expected to support both domestic and international launches for the first few years, pending regulatory approval of **rocapuldencel-T**.

**"Securing a lease for the CTI facility is a critical step on our path towards becoming a fully-integrated commercial-stage biotechnology company,"** said Jeff Abbey, president and chief executive officer of Argos. "Our two-stage manufacturing strategy positions us to employ an established and proven-effective manual manufacturing process at CTI with the capacity to support approximately 1,800 patients per year at launch, with expansion capacity to 2,400 patients per year, pending regulatory approval. **This strategy optimizes capital utilization as we prepare for a BLA submission for rocapuldencel-T** and also allows us to assess early commercial uptake and better project capacity requirements for our planned 125,000 square foot Centerpoint facility in Durham, NC, which can be designed to accommodate our automated manufacturing process."

"In our role of facilitating economic development, we applaud the commitment Argos is making to extend its research partnerships and North Carolina roots to Centennial Campus," said Dr. Alan Rebar, Vice Chancellor of Research, Innovation and Economic Development, at North Carolina State University. "We are excited that Argos has chosen CTI as it seeks to develop and commercialize cutting-edge

immunotherapies for people with serious illnesses and look forward to a productive partnership."

Emphasis Added.

44.    The statements above were false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, these statements were false and misleading and/or failed to disclose that: (i) the Arcentis technology platform was not viable; (ii) ADAPT was likely to be discontinued, and (iii) as a result of the foregoing, the Company's financial statements, as well as Defendants' statements about Argos' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

***The Truth Emerges***

45.    On February 22, 2017, prior to the market opening, Argos filed a Form 8-K with the SEC announcing that the IDMC for ADAPT recommended that the study be discontinued for futility, finding that the study was unlikely to demonstrate a statistically significant improvement in overall survival ("Feb. 2017 Form 8-K"). The Feb. 2017 Form 8-K stated in pertinent part:

**Item 8.01        Other Events.**

On February 22, 2017, Argos Therapeutics Inc. ("Argos" or the "Company") announced that **the Independent Data Monitoring Committee ("IDMC") for the Company's pivotal Phase 3 ADAPT clinical trial of rocapuldencel-T in combination with sunitinib/standard-of-care for the treatment of metastatic renal cell carcinoma has recommended that the study be discontinued for futility based on its planned interim data analysis. The IDMC concluded that the study was unlikely to demonstrate a**

**statistically significant improvement in overall survival in the combination treatment arm, utilizing the intent-to-treat population, the primary endpoint of the study.** The IDMC noted thatrocapuldencel-T was generally well-tolerated in the trial.

In conjunction with its clinical and scientific advisors, the Company is analyzing the preliminary ADAPT trial data set and plans to discuss the data with the U.S. Food and Drug Administration ("FDA"). The Company plans to leave the ADAPT trial open while the Company conducts its ongoing data review and discussions with FDA. Based on these analyses and discussions, the Company will make a determination as to the next steps for the rocapuldencel-T clinical program.

Emphasis Added.

46.     On the release of the news, the Company's share price declined from a closing price of $4.40 per share on February 21, 2017 to $1.48 per share on February 22, 2017, *a drop of approximately 66%.*

## ADDITIONAL SCIENTER ALLEGATIONS

47.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Argos, their control over, and/or receipt and/or modification of Argos's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Argos, participated in the fraudulent

scheme alleged herein.

## LOSS CAUSATION

48.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Argos' securities and operated as a fraud or deceit on Class Period purchasers of Argos securities by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Argos' securities fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Argos securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

49.     At all relevant times, the market for Argos' securities was an efficient market for the following reasons, among others:

a.   Argos securities met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.   Argos filed periodic public reports with the SEC and the NASDAQ; and

c.   Argos regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press

and other similar reporting services.

50.     As a result of the foregoing, the market for Argos' securities promptly digested current information regarding Argos from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of Argos securities during the Class Period suffered similar injury through their purchase of Argos securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

51.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Argos who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Argos securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

53.     The members of the Class are so numerous that joinder of all members is impracticable, since Argos has millions of shares of stock outstanding and because the Company's shares are actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

54.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class predominate over questions which may affect individual Class members, including:

>       d.  whether the Exchange Act was violated by Defendants;

>       e.   whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

>       f.  whether Defendants' statements omitted material facts necessary to make the

statements made, in light of the circumstances under which they were made, not misleading;

g. whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

h. whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

i. whether the price of Argos securities was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

j. whether the members of the Class have sustained damages as a result of the decline in value of Argos's stock when the truth was revealed, and if so, what is the appropriate measure of damages?

55. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

56. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

57. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of
### the Exchange Act and SEC Rule 10b-5
### (Against All Defendants)

58.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

59.     This Count is asserted by Plaintiff on behalf of himself and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

60.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Argos' securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Argos' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

61.     Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's securities in an effort to maintain artificially high market prices for Argos'

securities in violation of Section 10(b) of the Exchange Act and Rule 10-5.

62.     As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.     Defendants' material misrepresentations and omissions as set forth herein violated that duty.

63.     Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class.  Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

64.     As a result of Defendants' fraudulent activity, the market price of Argos was artificially inflated during the Class Period.

65.     In ignorance of the true financial condition of Argos, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Argos containing the misleading information, purchased or otherwise acquired Argos' securities at artificially inflated prices during the Class Period.

66.     Plaintiff and the Class's losses were proximately caused by Defendants' active and primary participation in Argos' scheme to defraud the investing public by,

among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased Argos' securities in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of Argos' securities through their misconduct as described herein. Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Argos.

67.     Throughout the Class Period, Defendants were aware of material non-public information concerning Argos' fraudulent conduct (including the false and misleading statements described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

68.     As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Argos common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

69.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

70.     During the Class Period, the Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees

thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiff and other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

71.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.

72.     Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

73.     The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Argos' business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their

positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, the Individual Defendants are responsible for the accuracy of Argos' corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

74.     The Individual Defendants acted as controlling persons of Argos within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Argos to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Argos and all of its employees. As alleged above, Argos is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

75.     As a direct and proximate result of the wrongful conduct of Argos and the Individual Defendants, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

(A)         Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and his counsel as Class counsel;

(B)        Awarding Plaintiff and the members of the Class damages, including interest;

(C)        Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees; and

(D)        Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


This the 14th day of March, 2017.

Respectfully submitted,

/s/Janet Ward Black
Janet Ward Black
North Carolina State Bar No. 12869
jwblack@wardblacklaw.com

/s/Nancy Meyers
Nancy Meyers
North Carolina State Bar No. 23339
nmeyers@wardblacklaw.com

**WARD BLACK LAW**
208 West Wendover Avenue
Greensboro, NC 27401-1307
Tel: 336-333-2244
Fax: 336-379-9415

**OF COUNSEL:**

Shannon L. Hopkins
shopkins@zlk.com
Stephanie A. Bartone
sbartone@zlk.com
**LEVI & KORINSKY LLP**
733 Summer Street, Suite 304
Stamford, Connecticut 06901
Tel: 203-992-4523
Fax: 212-363-7171